At a Court of Oyer and Terminer held at this term, Robert H. Goldsborough who had been indicted at the preceding term, was tried for the murder of Charles Marsh of the first degree, on the 10th day of December 1868 in Lewes and Rehoboth hundred. The evidence in the case consisted of the following facts and circumstances. The deceased was a bachelor residing on his farm near the ocean in the hundred mentioned, with a nephew of his named William H. Burton, the tenant of it, and the prisoner who since the month of September preceding had constituted the only members of the family. The latter, however, was away a few days almost every week, and was only there when he had nothing to do elsewhere, without paying for his board or receiving wages as a hand on the farm. Two of the witnesses who had gone there from Georgetown on a gunning excursion for the next day in the neighborhood, to spend the night on the 9th of December, the day preceding the murder, found no one at home on their arrival there about 9 o'clock that night, but the deceased returned about 1 o'clock. The two arose early the next morning and went gunning before breakfast, leaving the deceased alone in the house, but on their return for breakfast they found the prisoner there and also the deceased. After breakfast between 8 and 9 o'clock they went out gunning again in the direction of the shore, and invited both the deceased and the prisoner to go gunning with them, which they both declined, the deceased saying he *Page 304 
had to go to Lewes, and the prisoner that he had some work to do, but that he would be at the house when they came back to dinner from gunning, and would have dinner ready for them; but when they returned for it between half past 1 and 2 o'clock they found no one there. Some body had fed their horse in the stable, however, for he was not done eating his corn when they got back for dinner; and when they got up on the sand hills on coming back from the beach for dinner one of them saw some person driving off from the house a yoke of oxen and a cart with a hogshead in it, but could not see where it went, and did not see it again.
Another witness who lived about a mile from the deceased's farm in a south west direction, as he was walking over to the house of the latter that morning, saw him and the prisoner coming up from the beach towards the house, and when about a hundred yards from them, the prisoner called to him and asked him what he wanted. At the first and also the second enquiry from him, he did not answer, but when he had got near enough he told him he had come for the chisel which he had lent him. The three then went on together to the house, and the prisoner told him where he wound find it in the house, and soon after he had got it, the three started back from the house together down towards the branch, leaving no body at the house; but the prisoner said to him as they started that way together that the other way was his nearest way back to his home, to which he replied that he thought that was his nearest way and proceeded on with them in the direction of the branch, it was but a narrow path leading from the house of the deceased towards and around the branch, and they walked in single file, the deceased ahead, himself next and the prisoner behind them, they had not proceeded far, however, when the deceased stooped down and picked up a turtle gig and grubbing hoe lying by the side of the path, and then the prisoner stopped, stooped down and picked up a double barrelled gun also lying by the side of the path, and which he identified *Page 305 
as the same which was then produced and submitted to his inspection on the trial. They then proceeded on in the same order down the path towards the branch, the deceased carrying the gig and hoe, and the prisoner the gun, until they reached a point where it diverged from the direction of the branch towards his own house, when he turned up it in that direction from the deceased and the prisoner, while they proceeded straight on still towards the branch in the same order, the prisoner about four yards behind the deceased when he parted from them. When he had got about a half mile from them towards his home, he heard a loud report of a gun fire off, but he could not say from what direction. It was about 9 o'clock that morning when he left his home to go over there. The deceased had on a black soft felt or wool hat. He did not see the prisoner again until about 12 o'clock that day, and he was then walking very fast near his house going up the neck with a black pair of pants under his arm and a pair of boots in his hand, and called to him, but he made him no answer. He next saw him on the Monday night following at a neighbor's house two miles from that of the deceased, and the prisoner then said to him that Charles Marsh must be dead, and should be looked for. The witness and another had that day looked for him around the pond and branch in the direction in which the deceased and the prisoner were going when he parted from them on the day of the disappearance of the deceased, without finding him; but he renewed the search with three others, relations of the deceased, and a brother of the witness early the next morning, and went round the branch and pond and found his dead body lying as if it had fallen forward to the ground, breast downward and with the wounded side of the head and face turned upward, the left hand under it and the right arm and hand extended from it on the ground. The gun shown him was lying on one side of it upon the ground about ten or twelve inches from it, with one barrel discharged and the other still loaded; a turtle gig was also lying on the ground by the side of it, but *Page 306 
there was no grubbing hoe there, nor has the one he was carrying that morning ever been found there or elsewhere. There were also one picee and some smaller fragments of a black, soft felt hat, and the lining of it lying near his head, and a dark cloth cap uninjured lying some foot and a half from it, and in his pocket a wallet or purse with $15 in it, also powder in a horn and shot in his pocket in a shot-bag. About one-third of his head was gone and had been shot and blown away. On the Monday night before spoken of the prisoner told the witness that the last he saw of the deceased, he went to his house and took a drink and went off on the day he disappeared. He next saw the prisoner the morning after the body of the deceased had been discovered, and when he told him that he heard a gun fired not long after he had parted from him and the deceased on his way back home on the day the deceased disappeared, he replied that he heard no gun and was so busy plastering at the deceased's house that day, and there were so many guns fired about there, that if there had been a thousand fired that morning he would not have heard one of them. On the morning after deceased's body was found, the prisoner told him that after he left him and Marsh at the branch they went round the pond to a persimmon tree and dug some holes, and that he left Marsh there, and then went back to the house.
Wm. J. Burton, the nephew and tenant of the deceased, testified that he left his house on Tuesday, the 8th of December, and went to his mother's in that neighborhood to superintend the slaughtering of her hogs, and returned on the following Saturday, and that he left the prisoner there when he went away with his uncle, and he was the only person then left with him. He had been staying there since the 21st of September preceding, and had done some plastering in the house, but none that he could discover since the preceding Monday. That when he came there he told him he had five dollars, and that it was all the money he had and that the witness knew that his uncle had received about two weeks before the murder *Page 307 
$485 in paper money which he carried in his pocket folded up in brown paper, and he recognized and identified the little old pocket-book or wallet found in the pocket of the deceased after his death, with $15 in it, as the property of his uncle, and which he had seen only a few days before in a trunk in one of the lower rooms of his house, and had seen the prisoner in that room only the day before he left there to go to his mother's; but the wallet had only a few cents in it when he last saw it; and that on the same day his uncle was talking in the presence of the prisoner of going to Philadelphia to buy some clothes and carpets for his house, and when he requested him to delay it until his return from his mother's, where he was going the next day. He also identified the cloth cap found and picked up near the head and body of the deceased, as belonging to his uncle, and which he had some time before found on the sea-shore, but had not seen him wear it but once that fall; it was kept hanging on a nail in the kitchen. In October the prisoner had asked him what his uncle did with his money, and he knew that he had received the $485 spoken of before, about two weeks previous to the murder. He next saw the prisoner at his mother's about sunset on Thursday, the 10th day of December, and he there requested him to send his clothes to him from his uncle's house, and said he would not be back there any more; he enquired of him how his uncle was, and he said he had taken his gun that morning and gone down on the bank muskratting.
Another witness testified that he was at Andrew J. Marsh's on Thursday, the 10th day of December, and about 11 o'clock that morning, the prisoner came up there from the direction of the deceased's farm, and wanted to borrow an augur and said he was going to make a ladder, and asked Marsh to go with him to the deceased's place and help him make it, but he was killing his hogs and told him he could not go. He said the deceased had taken his gig and gun and gone off, he did not know where.
Andrew J. Marsh testified, that on that day he was *Page 308 
killing hogs, and between half-past 10 and 11 o'clock the prisoner came to his house, and wanted an augur to make a ladder, and asked him to go and help him, but he told him he could not. He said the deceased had gone off with his gig and gun, and when invited by him to remain for dinner, he said he could not stay, that some gunners were to be at the deceased's house for dinner, and he had to go back and get it for them. He did not remain more than twenty minutes, and left about 11 o'clock.
Lemuel W. Marsh testified that the prisoner was at his house, two miles and a half from the deceased's farm, at 12 o'clock on Thursday, the 10th of December, and when he came he took a seat in the kitchen door, which was open. He seemed very warm, and there were large drops of perspiration on his face and forehead, although the day was quite cold. Witness's wife requested him on that account to shut the door, when the prisoner said, "For God's sake, don't shut the door! I am sweating like a horse, and if I haven't come since I left Charles Marsh's in a horse gait, shoot me!" While he was there the witness's brother came up with a cart and oxen, and asked the prisoner to go back with him to Charles Marsh's; he said "No, Thomas, I have overstayed my time, and ought to be at Catherine Burton's now." She was a sister of the deceased. And the wife of the preceding witness also testified that when the prisoner came up and took a seat in the kitchen door, he threw down a pair of pants and said, "there were more gunners down at Charles Marsh's;" when she asked if Charles was not tired of gunners, he said he did not know, but Charles had gone away with his gun, he did not know where, before he got there, and he then said he was done at Charles Marsh's, and ought to have been at Catherine Burton's before that time.
Catherine W. Futcher testified, that the prisoner stopped for a few moments at their house about half-past 12 o'clock on Thursday, the 10th of December, and she invited him to come in and take a seat, but he said he had not time, that he was on his way to Mrs. Catherine Burton's, *Page 309 
and had waited at Charles Marsh's for him to come home, until he could wait no longer, and was now behind time to do a half day's work that afternoon at Mrs. Burton's.
Charles W. Burton, a boy, testified that he was at his mother's, Catherine Burton's, Friday morning, the day after the deceased disappeared; the prisoner was there, and said he must have some whiskey, and taking a five dollar note out of his pocket, said it was the last money he had, and he hated to break it, but he must have some whiskey, and gave it to him to ride up to a store in the neck and buy him a quart, which he did, and when he brought it to him with the change, he gave him twenty-five cents out of it. He drank very often, and wanted another quart by noon that day, which he got for him in the afternoon, and another the next morning, which he also got for him.
Lemuel M. Burton testified that he went with the prisoner from his mother's, Catherine Burton's, after dinner on Saturday, the 12th day of December, down to the prisoner's father's, and while there he saw him take a roll of bank notes from his pocket, and extending his hand towards his father, and with the ends of the notes projecting and plainly visible beyond his fingers and thumb, heard him say to him, "Pa, will you take a chew of tobacco?" And to which he replied, merely, "None of your nonsense, Bob." And that on the Monday following they were again at his mother's, and his sister was weeping over the strange disappearance of their uncle, and said she feared he was dead, when the prisoner replied that there was not a bit of doubt in his soul that he was dead, and that his body ought to be searched for, and when found he would be found dead in the woods along the branch, with his gig and gun beside him, and then added, "didn't I tell you, Penn, Charles Marsh would shoot himself with that gun, that the right barrel was easy on the trigger?" *Page 310 
Joseph W. Hudson testified that the prisoner was at his house in that neighborhood, on Tuesday morning after the disappearance of the deceased, and several other persons were also there, but no one had alluded to it before the prisoner remarked "that is a great go about Charles Marsh!" Witness asked what was it? He replied that he was missing. He then said that Charles and he went musk-ratting on Thursday morning, and when they got to a little glade round the branch, Charles told him to go back and finish plastering the kitchen, and took the gun, grubbing hoe and gig, and that he had not seen him since they then parted, that Charles went on and he went back to the house, finished the plastering and then left. The witness then asked him if he might not have gone to some of his neighbors, and he replied that he did not think he would go to any of them dressed as he then was. He then said he had no doubt he had shot himself; and he also said that Charles had near five hundred dollars about him that morning.
The physicians who saw and examined the body soon after it had been found, before the coroner's inquest, testified that the death had been produced by a gun shot wound in the head, and that the load of shot had entered the back part of it, passed through the skull and came out at the right eye or a little above it. All the right side of the top of the skull had been carried or blown away by it, the right hemisphere of the large brain was gone, also the right eye was entirely blown to pieces, the bones of the nose were all there, but torn loose, the right cheek bone was also loose, the right ear was also torn and blown to pieces, and the back of the neck and hair were blackened and singed as by exploding gun powder. It would seem that the load must have entered and come out in a body, and the muzzle of the gun could not have been but a short distance from the back of the head when the load of powder and shot was discharged from it. The wound was mortal and death must have ensued instantly, almost. There was also an oblique fracture of the skull across the *Page 311 
centre of it in the direction of the left eye technically termed a depressed fracture, which could not have been produced as the other wounds and fractures were, and which they thought might have been produced by a blow upon it with the stock of the double barrelled gun which was found by the side of the dead body with the breech of it broken.
Several of the witnesses also testified that they found the foot prints of two persons in the ground where the soil was light and loose enough to receive them, proceeding to within one hundred and fifty yards where the body was found and in that direction, and which could not be traced any further because of the nature and hardness of the ground from that point to where it was lying, and that they were near about in the same line, as of two persons walking one after the other, and not by the side of each other; that one pair of them was considerably larger than the other, and when they were afterwards severally measured with the boots which the deceased, and also with those which the prisoner wore on the morning of the murder, those of the deceased not only fitted in length and breadth with the larger pair, but even corresponded in the impression which a patch on the sole of one of them had made in the tracks, while those of the prisoner as closely fitted the smaller tracks. There was also a line of the smaller footprints starting from the direction in which the body lay and proceeding towards the house.
that the death of Charles Marsh, for the murder of whom the prisoner is indicted, had been established by the evidence, and that it was produced by a gun shot wound in the back part of the head and neck which was scorched and discolored with the exploded powder, and the nature, extent and fatal effect of which had also been clearly established in the evidence; but whether the gun was charged with leaden shot, or other deadly substance which produced it, was not material in the case. When a man comes to his death in such a manner the law does not presume that it was by his own hand, or by accident, either, but by violence at the hand of some other person; and hence it becomes the duty of the coroner of the county to institute an official investigation into the cause of it, and to arrest and commit the perpetrator of it, if ascertained, and the evidence in his judgment shall warrant it, in order that he may be tried for it before a Court and jury, and the law vindicated, if on indictment and a full and fair trial he be found guilty of the offense.
In the course of the testimony the jury had learned all the facts and circumstances from the sworn witnesses examined in the case, on which the State relies for the conviction of the prisoner of the crime with which he is charged in the indictment, and which is the murder of Charles Marsh on the 10th day of December last in Lewes and Rehoboth hundred in this county, with express malice aforethought, and of the first degree under the statute. And in order that you may understand the meaning and import of these terms in contemplation of law, we say to you that express malice aforethought is when one person kills another with a sedate, deliberate mind and formed *Page 314 
design, such formed design being evidenced by external circumstances discovering the inward intention, such as lying in wait, antecedent menaces, former grudges, and concerted schemes to do the party some bodily harm. These however, are but some of the instances given for the sake of examples or illustrations in which the external or attending circumstances will evidence the sedate, deliberate mind and formed design to kill, or to do the party killed some bodily harm, for whenever in any other case the attending circumstances evidence such a mind and design to do the act, and death ensues, it constitutes in law express malice aforethought, and murder of the first degree under the statute, and is punishable with death; as where one, either from motives of hatred or revenge, or with a view to rob him of his money or get possession of any other thing about his person, coolly and deliberately forms the design in his mind to kill another, or wound and disable him for that purpose, and commits the act, either by lying in wait for him, or in any other maimer, and his death ensues as the consequence of such bodily injury, it is likewise murder with express malice aforethought, and of the first degree under the statute. There is no direct evidence in the case that the prisoner killed the deceased, and if he is guilty of killing him, there has been no fact or circumstance proved in the case that requires of us to define or describe the crime of murder of the second degree under the statute, or any other grade of felonious homicide under it. On the contrary, all the evidence in it is what is called circumstantial evidence exclusively.
But circumstantial, or presumptive evidence is receivable in both civil and criminal cases. The affairs and business of the world could not well be carried on without recognizing the admissibility of this description of evidence. In criminal matters the necessity of admitting it is indeed much more manifest, than in civil matters. Crime usually seeks secrecy; and the possibility of proving the offense charged by direct or positive evidence, is *Page 315 
much more rare and difficult in criminal cases than in civil cases. Circumstantial or presumptive evidence is, where some facts being proved, another fact follows as a natural or very probable conclusion from the facts actually proved, so as readily to gain the assent of the mind from the mere probability of its having actually occurred. It is the inference of a fact from other facts proved; and the facts thus inferred and assented to by the mind, is said to be presumed, that is to say, it is taken for granted, until the contrary be proved. And this is what is called circumstantial or presumptive evidence; and it is adopted the more readily, in proportion to the difficulty of proving the fact by direct evidence, and the obvious ease with which it can be disproved, or with which other facts can be proved, which are inconsistent with it, if it never really occurred
In capital felonies, such as murder, where the proof is of a circumstantial character, it is quite usual for the counsel to declaim against circumstantial evidence, and to denounce and reprobate conviction, founded upon such evidence; and yet, the universal experience of those engaged in the administration of justice, shows the absolute necessity of admitting it, and of relying on it, in forming our conclusions in regard to the guilt or innocence of the accused persons. Indeed, if Courts of Justice, were to exclude circumstantial evidence, the great majority of criminals would escape the just penalty of their crimes. They would go unwhipped of justice, and be turned loose upon the community to commit other crimes. But whilst I say this, I also say to you, most emphatically that circumstantial evidence, to warrant a conviction, must be entirely satisfactory, and of such significance, consistency, and force, as to produce conviction in the minds of the jury, of the guilt of the accused, beyond a reasonable doubt. The great rule on the subject is this; that where the evidence is circumstantial, the jury must be fully satisfied, not only that those circumstances are consistent with the prisoner's having committed the act *Page 316 
charged as constituting the crime, but they must also be fully satisfied that the facts are such as to be inconsistent with any other rational conclusion than that the prisoner was the party. They must be such as to exclude any other hypothesis or conclusion.
The facts and circumstances proved in the case with the legitimate inferences resulting from them, and on which the State relies for the conviction of the prisoner in manner and form as he stands indicted, were all now before the jury, and by that evidence alone was the question of his guilt or innocence to be determined by them. But there is a marked distinction between civil and criminal cases in respect to the degree or quantity of evidence necessary to justify a jury in finding their verdict for the State. In civil cases their duty is to weigh the evidence carefully, and to find for the party in whose favor it preponderates, although it may not be free from reasonable doubt. But in criminal trials the party accused is entitled to the benefit of the legal presumption in favor of innocence, which in doubtful cases is always sufficient to turn the scale in his favor. It is therefore a rule of criminal law that the guilt of the accused must be fully proved; and neither a preponderance of evidence, nor any weight of preponderating evidence is sufficient, unless it produces full belief of the fact to the exclusion of all reasonable doubt in the mind of the jury. But that does not import in contemplation of law a mere possible doubt; because every thing relating to human affairs, and depending on moral evidence, is open to some possible or imaginary doubt. It is that state of the case which after entire comparison and consideration of all the evidence, leaves the minds of jurors in that condition that they cannot feel any abiding conviction, to a moral certainty, of the truth of the charge. The burden of proof is upon the prosecutor. All the presumptions of law, independent of evidence, are in favor of innocence; and every person is presumed to be innocent of the offense charged until he is proved to be guilty. If upon such proof there is reasonable doubt remaining, the *Page 317 
accused is entitled to the benefit of it by an acquittal, for it is not sufficient to establish a probability, though a strong one, arising from the doctrine of chances, that the fact charged is more likely to be true than the contrary; but the evidence must establish the truth of the fact to a reasonable and moral certainty; a certainty that convinces and directs the understanding, and satisfies the reason and judgment of those who are bound to act conscientiously upon it. This we take to be proof beyond reasonable doubt; because if the law, which mostly depends upon considerations of a moral nature, should go further than this, and require absolute certainty, it would exclude circumstantial evidence altogether.
The verdict was guilty of murder of the first degree.